Thomas A. KOZOIDEK, etc., et al.

v.

GEARBULK, LTD., et al.

BURIES MARKES, LTD., et al.

v.

RUKERT MARINE CORPORATION
et al.

Bernard JOHNSON, Jr., Etc., et al.

v.

ATLANTIC CONTAINER LINES,
LTD., et al.

Frederick HOUSTON et al.

v.

MURMANSK SHIPPING COMPANY.

Civ. Nos. K–77–52, K–78–164
and K–78–1373.

United States District Court,
D. Maryland.

Dec. 17, 1979.

**514**

John F. Burgan and Phillips L. Goldsborough, III, Jon H. Grube and Smith, Somerville & Case, Baltimore, Md., for plaintiffs in Civ. No. K–77–52.

Murray I. Resnick, Baltimore, Md., for plaintiffs in Civ. No. K–78–164.

Bernard M. Goldstein, Baltimore, Md., for plaintiffs in Civ. No. K–78–1373.

Richard R. Jackson, Jr., James B. Wieland and Ober, Grimes & Shriver, Baltimore, Md., for defendants, other than the Rukert defendants, in Civ. No. K–77–52; H. Emslie Parks and Thomas A. Appel, Towson, Md., for Rukert defendants in Civ. No. K–77–52.

Randall C. Coleman, Warren B. Daly, Jr. and Ober, Grimes & Shriver, Baltimore, Md., for defendants in Civ. Nos. K–78–164 and K–78–1373.

FRANK A. KAUFMAN, District Judge.

One common question is posed in these three cases.[1] In each of them injuries to longshoremen are asserted to have occurred within the territorial waters of the United States and to have been caused by the negligence of a shipowner. In each of them, the injured longshoreman and his wife seek together to recover for loss of consortium.[2] Defendants in these cases have moved to dismiss or to strike the consortium claims. The resolution of the issues presented by those motions rests heavily on the continued vitality of Judge Friendly's conclusions in *Igneri v. Cie. de Transports Oceaniques*, 323 F.2d 257 (2d Cir. 1963), cert. denied, 376 U.S. 949, 84 S.Ct. 965, 11 L.Ed.2d 969 (1964). In *Igneri*, a longshoreman, who was injured on a ship in Brooklyn harbor, brought suit for his own injuries. His wife, as a party plaintiff, claimed for loss of consortium. The wife's said claim "presented for the first time in a federal Court of Appeals," *Igneri* at 258, the issue posed herein. *Igneri*, with its complete historical review of the subject of consortium and its probing common law and maritime law analyses, has indeed become a seminal case, and has been and is widely cited and followed. *See, e. g., Wetters v. Moore-McCormack Lines*, 1977 AMC 1529 (D.Md. 1977) (Murray, J.); *Sanseverino v. Alcoa Steamship Co.*, 276 F.Supp. 894 (D.Md.1967) (Thomsen, C. J.).[3] Recently, however, the Court of Appeals of New York, in a 5–1 opinion, in *Alvez v. American Export Lines*, 46 N.Y.2d 634, 415 N.Y.S.2d 979, 389 N.E.2d 461, 1979 AMC 906 (N.Y.Ct.App.1979), cert. granted, —— U.S. ——, 100 S.Ct. 261, 62 L.Ed.2d 180 (1979), and Judge Duffy, in *Doca v. Marina Mercante Nicaraguense S. A.*, 474 F.Supp. 751 (S.D.N.Y.1979), decided not to apply *Igneri*[4] in view of the many changes and developments wrought since 1963 by the Supreme Court in three opinions in the admiralty field and by the Supreme Court, many other courts, and a number of state legislatures in the area of consortium. In so doing, the Court of Appeals of New York in *Alvez* expressly rec-

---

1. Jurisdiction in *Kozoidek* is claimed and exists under 28 U.S.C. § 1333(1). In *Johnson*, initiated in a Maryland state Court and removed to this Court, and in *Houston*, diversity jurisdiction is claimed and is present.

2. Each of the longshoremen also seeks recovery for his own injuries.

3. Also, in *Merriman v. Taurus Enterprises Corp.*, Civil No. N–76–1659, Chief Judge Northrop of this Court signed an Order on August 31, 1978 granting defendant's motion to strike the consortium claim from the complaint, and

in *Conley v. United Overseas Export Lines, Ltd.*, Civil No. H–76–590, Judge Harvey of this Court stated on September 28, 1976 in a letter to counsel that he would follow *Sanseverino*. Copies of Judge Northrop's said Order and Judge Harvey's said letter are included in the court files in these cases.

4. Several other courts had previously determined not to follow *Igneri* in the face of Supreme Court decisions overruling long-established precedents in the admiralty area. *See* p. 519, *infra*.

ognized (415 N.Y.S.2d at 980–81, 389 N.E.2d at 462–63, 1979 AMC *supra* at 908–09) that it was required to apply general maritime law. Judge Duffy, in so doing in *Doca*, followed Judge Lasker's lead in *Giglio v. Farrell Lines, Inc.*, 424 F.Supp. 927 (S.D.N.Y.1977), *leave to appeal denied*, No. 77–8014 (2d Cir. Feb. 17, 1977).[5]

Any analysis of the availability or unavailability of a consortium remedy in a longshoreman's personal injury case must start at the threshold with the recognition that no federal statute either precludes or makes available such a consortium claim. The Jones Act, 46 U.S.C. § 688, applies to seamen and not to longshoremen.[6] The Death on the High Seas Act, 46 U.S.C. § 761 *et seq.*, does not apply where, as in the within three cases, the plaintiff-longshoremen were (1) injured, and not killed, and (2) injured in territorial waters.[7] The Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 904–905, does not specifically preclude a suit for loss of consortium against the vessel. Title 33

U.S.C. § 905(a)[8] indicates that a suit for loss of consortium cannot be brought against the *employer*. However, the suits before this Court are all against shipowners who are not the employers of the injured longshoremen. Title 33 U.S.C. § 905(b)[9] does not preclude suits for loss of consortium such as those involved here.

■ Where Congress has not passed a statute dealing specifically with a given cause of action or remedy in admiralty, courts look to the general maritime law to ascertain whether a given element of damages may be allowed. *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978); *Igneri, supra* at 259. Accordingly, this Court turns to general maritime law—and the "many sources" upon which it "draws," *Igneri* at 259—to determine whether a longshoreman and his wife may together assert a cause of action for loss of consortium where the longshoreman was injured within territorial waters by the alleged negligence of the vessel.

---

5. In dissent in *Alvez*, Judge Jones (415 N.Y.S.2d at 984 n. 1, 389 N.E.2d at 466 n. 1, 1979 AMC at 914 n. 1) wrote:

> In *Giglio*, a panel of the Court of Appeals for the Second Circuit declined an express invitation to overrule *Igneri*. That the court thereby left standing the District Court's view that the time may have come for such overruling is not to be construed as approval or rejection of that view (*cf.* the denial of petitions for *writs of certiorari* by the United States Supreme Court). It is noted that the *Giglio* case has subsequently been dismissed in its entirety (S.D.N.Y., Docket No. 75 Civ. 6359 [1/5/79]) and an appeal is now pending from that disposition (2 Cir., Docket No. 79–7078).

6. *See Westcott v. McAllister Brothers, Inc.*, 463 F.Supp. 1039, 1041–42 (S.D.N.Y.1978); *Wetters v. Moore-McCormack Lines, Inc.*, 1979 AMC at 1537.

7. *See Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 623–25, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978).

8. 33 U.S.C. § 905(a) provides in relevant part:
> The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in

admiralty on account of such injury or death, * * *.

9. 33 U.S.C. § 905(b) reads as follows:
> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

■ A second threshold matter concerns the applicable law. One of the sources of general maritime law is the common law, including the decisional law of the state of the forum. However, Maryland law does not control herein. Nor did New York law control in *Igneri* as Judge Friendly specifically noted (at 259): "Mrs. Igneri's claim is governed not by the law of New York but by the general maritime law." [10] That does not mean, however, that the common law, including the law of New York, played no role in *Igneri*. To the contrary, Judge Friendly specifically noted (at 259–60) the effect of New York law not generally providing a consortium remedy to the wife of an injured male plaintiff:

Although New York's denial of a claim by a wife for loss of consortium is thus in no way decisive, it does not follow that reference to the common law generally is without relevance. Maritime law draws on many sources; when there are no clear precedents in the law of the sea, admiralty judges often look for the law prevailing on the land. [Citation omitted.] At least this much is true. If the common law recognized a wife's claim for loss of consortium, uniformly or nearly so, a United States admiralty court would approach the problem here by asking itself why it should not likewise do so; if the common law denied such a claim, uniformly or nearly so, the inquiry would be whether there was sufficient reason for an admiralty court's nevertheless recognizing one. [Citation omitted.] So we turn to the common law.

*Igneri* was decided in 1963, at a time when only 12 states (including the District of Columbia, *see Hitaffer v. Argonne Co.*, 87 U.S.App.D.C. 57, 183 F.2d 811 (D.C. Cir.), *cert. denied*, 340 U.S. 852, 71 S.Ct. 80, 95 L.Ed. 624 (1950), *overruled in part, Smither & Co. v. Coles*, 100 U.S.App.D.C. 68, 242 F.2d 220 (D.C. Cir.), *cert. denied*, 354 U.S. 914, 77 S.Ct. 1299, 1 L.Ed.2d 1129 (1957)) permitted a wife to sue for loss of consortium. *Igneri* at 260–61. As of April 3, 1979, the date when *Alvez v. American Export Lines, Inc., supra*, was decided, 36 states afforded a wife the right to sue for loss of consortium. 415 N.Y.S.2d at 982 n.4, 389 N.E.2d at 463 n.4, 1979 AMC at 909–10 n. 4.[11]

While Judge Friendly clearly did not rely solely on the common law's attitude toward suits by a wife for consortium damages, that attitude was an important factor in his decision. That factor, which in 1963

10. Like *Johnson* and *Houston* (*see* n. 1 *supra*), *Igneri* was a diversity suit. *Igneri* at 259. Thus, federal maritime law is the applicable law in *Johnson* and *Houston*. *Kozoidek* (*see* n. 1) is a case brought in this Court pursuant to admiralty jurisdiction. If general maritime law is applicable in *Johnson* and *Houston*, it is *a fortiori* applicable in *Kozoidek*. The case law so teaches, *i. e.*, that federal maritime law is applicable to the within three cases. *See, e. g., Alvez*, 415 N.Y.S.2d at 980–81, 389 N.E.2d at 462–63, 1979 AMC at 908–09; *Lemon v. Bank Lines Ltd.*, 411 F.Supp. 677, 678 (S.D.Ga.1976), *dismissed* (in light of *Christofferson v. Halliburton Co.*, 534 F.2d 1147 (5th Cir. 1976)) No. CV 476–33 (S.D.Ga. March 14, 1977), *aff'd without opinion*, 562 F.2d 1259 (5th Cir. 1977).

In *Igneri*, the wife asserted a consortium claim solely in her own name. In *Kozoidek, Johnson* and *Houston*, the consortium claims are stated by husband and wife acting together in accordance with Judge Oppenheimer's penetrating and imaginatively affirmative approach in *Deems v. Western Maryland Ry.*, 247 Md. 95, 231 A.2d 514 (1967), and also with current practice in this Court in the wake of *Deems* in diversity cases in non-admiralty contexts and in certain admiralty contexts since the decision in *Sea-Land Services v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974). Thus, neither the equality issue nor the problem of double recovery discussed in *Igneri, supra* at 262–65, is present herein. As to double recovery, it is doubtful in any event whether difficulty in assessing damages should alone bar the existence of a remedy. *See Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 384–85, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). As to the equality issue, Judge Friendly's closing comment in *Igneri* (at 268) that "we would reach the same result in the rare case of the husband of a seawoman as in the common ones of the wife of a seaman or of the stevedore doing seaman's work" is also to be noted.

11. Judge Friendly in *Igneri* (at 261 n. 9) listed 19 jurisdictions which had reaffirmed their denial of the right of a wife to sue for consortium damages between the issuance of *Hitaffer* and *Igneri*. Between *Igneri* and *Alvez*, 15 of those jurisdictions changed their law to permit suits by a wife for consortium damages.

weighed against affording to a wife the right to sue for loss of consortium in longshoreman personal injury suits, presently weighs in favor of allowing such suits. As the Court of Appeals of New York noted in *Alvez* (415 N.Y.S.2d at 983, 389 N.E.2d at 464, 1979 AMC at 911), and as Judge Lasker indicated in *Giglio* (424 F.Supp. at 930), the "gravitational pull" of the common law, *Igneri, supra* at 267, pulls in the opposite direction from that in which it "pulled" in *Igneri*. Nevertheless, *Igneri*, since 1963, has attained its own independent importance. Thus, the argument can be made that, whatever changes may have occurred since 1963 in the common law, the *Igneri* rule should continue to stand. The validity of that approach would appear, however, to have been weakened by the Supreme Court's decisions in *Mobil Oil Corp v. Higginbotham*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978), *Sea-Land Services v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), and *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).

In *Moragne*, the Supreme Court created a remedy for wrongful death under general maritime law in a case involving the death of a longshoreman aboard a vessel on navigable waters within the State of Florida.[12] In reaching that result, Mr. Justice Harlan, in an 8–0 decision, gave great weight to the change in the attitude of the common law toward wrongful death actions, and wrote (at 388, 390–93, 90 S.Ct. at 1781–1783):

> We need not, however, pronounce a verdict on whether *The Harrisburg* [119 U.S. 199 (1886) 7 S.Ct. 140, 30 L.Ed. 358], when decided, was a correct extrapolation of the principles of decisional law then in existence. A development of major significance has intervened, making clear that the rule against recovery for wrongful death is sharply out of keeping with the policies of modern American maritime law. This development is the wholesale abandonment of the rule in most of the areas where it once held sway, quite

evidently prompted by the same sense of the rule's injustice that generated so much criticism of its original promulgation.

> To some extent this rejection has been judicial. * * *

> In the United States, every State today has enacted a wrongful-death statute. [Citation omitted.] The Congress has created actions for wrongful deaths of railroad employees, [citation omitted], of merchant seamen, [citation omitted], and of persons on the high seas, [citation omitted]. * * *

> * * * [T]here is no present public policy against allowing recovery for wrongful death. * * * This legislative establishment of policy carries significance beyond the particular scope of each of the statutes involved. The policy thus established has become itself a part of our law, to be given its appropriate weight not only in matters of statutory construction but also in those of decisional law. * * *

> This appreciation of the broader role played by legislation in the development of the law reflects the practices of common-law courts from the most ancient times. * * *

> * * * [I]t is sufficient at this point to conclude, as Mr. Justice Holmes did 45 years ago, that the work of the legislatures has made the allowance of recovery for wrongful death the general rule of American law, and its denial the exception. Where death is caused by the breach of a duty imposed by federal maritime law, Congress has established a policy favoring recovery in the absence of a legislative direction to except a particular class of cases.

In *Moragne* the Supreme Court placed great weight not only upon change made directly in the common law by the courts, but also upon change made by legislative

---

**12.** Judge Lawrence in *Lemon v. Bank Lines, Ltd.* (at 679) wrote that "[i]n 1970 [in *Moragne*] a fresh breeze suddenly blew in across the waters of American admiralty law." *See infra* at p. 519.

bodies.[13] But what seemingly influenced the Supreme Court even more greatly was the significant change in the attitude of the state courts and state legislatures toward the remedy.

In *Gaudet*, the Supreme Court decided that the widow of a longshoreman, injured aboard defendant's vessel in navigable waters within the State of Louisiana, had a cause of action under general maritime law for his wrongful death. Mr. Justice Brennan, in a 5–4 decision, concluded that the wife could, in asserting that cause of action, claim for loss of consortium. In so holding, the Supreme Court gave greater weight to the attitude of the common law and of state legislatures toward such recovery than to the effect of an arguably analogous statute—the Death on the High Seas Act. Mr. Justice Brennan wrote (414 U.S. at 587–88 & fn. 22, 94 S.Ct. at 816 & fn. 22):

> A clear majority of States, on the other hand, have rejected such a narrow view of damages, and, either by express statutory provision or by judicial construction, permit recovery for loss of society. This expansion of damages recoverable under wrongful-death statutes to include loss of society has led one commentator to observe that "[w]hether such damages are classified as 'pecuniary,' or recognized and allowed as nonpecuniary, the recent trend is unmistakably in favor of permitting such recovery." (S. Speiser, Recovery for Wrongful Death 218 (1966)). Thus, our decision to permit recovery for loss of society aligns the maritime wrongful-

death remedy with a majority of state wrongful-death statutes.[22] But in any

22 We recognize, of course, that our decision permits recovery of damages not generally available under the Death on the High Seas Act. Traditionally, however, "Congress has largely left to this Court the responsibility for fashioning the controlling rules of admiralty law," *Fitzgerald v. United States Lines Co.*, 374 U.S. 16, 20, [83 S.Ct. 1646, 1650, 10 L.Ed.2d 720] (1963). The scope and content of the general maritime remedy for wrongful death established in *Moragne* is no exception. After combing the legislative history of the Death on the High Seas Act, we concluded in *Moragne* that Congress expressed "no intention . . . of foreclosing any nonstatutory federal remedies that might be found appropriate to effectuate the policies of general maritime law." 398 U.S., at 400 [90 S.Ct., at 1787]. Nothing in the legislative history of the Act suggests that Congress intended the Act's statutory measure of damages to pre-empt any additional elements of damage for a maritime wrongful-death remedy which this Court might deem "appropriate to effectuate the policies of general maritime law." To the contrary, Congress' insistence that the Act not extend to territorial waters, see [citations to Cong.Rec. omitted], indicates that Congress was not concerned that there be a uniform measure of damages for wrongful deaths occurring within admiralty's jurisdiction, for in many instances state wrongful-death statutes extending to territorial waters provided a more liberal measure of damages than the Death on the High Seas Act. [Citations omitted].

event, our decision is compelled if we are to shape the remedy to comport with the humanitarian policy of the maritime law to show "special solicitude" for those who are injured within its jurisdiction. [Footnotes 21 and 23 omitted].

---

13. *But see Christofferson v. Halliburton Co.*, 534 F.2d 1147, 1150 (5th Cir. 1976). In *Skidmore v. Grueninger*, 506 F.2d 716, 728 n. 10 (5th Cir. 1975), the Fifth Circuit based its decision that damages were available for loss of consortium in maritime [passenger] wrongful death actions in part upon the fact that "loss of consortium is a common element of damages in the majority of wrongful death actions." In *Christofferson*, the Fifth Circuit concluded (at 1150) that "Mrs. Christofferson's argument that *Igneri* would now be decided differently because a majority of the states now permit the recovery which the court denied in *Igneri* is without merit. * * * Recognition of a wife's claim by some 37 states * * * does not mean that the common law is uniform, or nearly so." As the dissent in *Christofferson*

points out, there seems to be a difference in the approach taken in *Skidmore* and the approach taken in *Christofferson*. The majority in the latter case did not mention the former. 534 F.2d at 1154 (Freeman, District Judge, dissenting). It is to be noted that when *Igneri* was decided, only 12 out of 50 states allowed a wife to recover for loss of consortium. In 1976, when *Christofferson* was written, only 13 states (according to that opinion) did *not* allow a wife to recover for loss of consortium. It is also to be noted that *Christofferson* involved a suit resulting from injury to a seaman, and not a longshoreman. However, the Court in that case employed an *Igneri*-type analysis in reaching its decision not to allow the cause of action, even though the Jones Act would appear to have covered the situation.

In *Higginbotham*, the Supreme Court held that no cause of action for loss of consortium existed where the death of passengers killed in the crash of a helicopter took place outside of the territorial waters of Louisiana. Mr. Justice Stevens concluded that the Death on the High Seas Act covered the accident and that an action for loss of consortium could not be brought. In so doing, the Justice wrote (414 U.S. at 623–25, 98 S.Ct. at 2014–2015):

> Congress has struck the balance for us. It has limited survivors to recovery of their pecuniary losses. Respondents argue that Congress does not have the last word on this issue—that admiralty courts have traditionally undertaken to supplement maritime statutes and that such a step is necessary in this case to preserve the uniformity of maritime law. Neither argument is decisive.
>
> \*   \*   \*   \*   \*   \*
>
> We realize that, because Congress has never enacted a comprehensive maritime code, admiralty courts have often been called upon to supplement maritime statutes. \* \* \*
>
> \* \* \* There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted.

*Moragne, Gaudet* and *Higginbotham* have all been decided since *Igneri*. Other relevant developments have also occurred since *Igneri*. In that case, after examining the common law, Judge Friendly turned to maritime law to determine which result, "the historic common law position [disallowing consortium damages] or the *Hitaffer* result [allowing such damages] comports better with other relevant elements of maritime law," 323 F.2d at 265, and noted, at 265–66:

> We have found no maritime cases relating to claims by wives for loss of consortium other than the district court decisions denying such claims by wives of longshoremen which we cited at the outset, and certain decisions denying such claims by wives of seamen which we will discuss below.

This has changed since 1963, as witness the several decisions which have allowed suits for loss of consortium in longshoremen personal injury cases. *Doca v. Marina Mercante Nicaraguense, S.A.*, 474 F.Supp. 751 (S.D.N.Y.1979); *Giglio v. Farrell Lines, Inc.*, 424 F.Supp. 927 (S.D.N.Y.1977), *leave to appeal denied*, No. 77–8014 (2d Cir. Feb. 17, 1977); *Lemon v. Bank Lines, Ltd.*, 411 F.Supp. 677 (S.D.Ga.1976), *dismissed* (in light of *Christofferson v. Halliburton Co.*, 534 F.2d 1147 (5th Cir. 1976), No. CV 476–33 (S.D.Ga. March 14, 1977)), *aff'd without opinion*, 562 F.2d 1259 (5th Cir. 1977); *Alvez v. American Export Lines, Inc.*, 46 N.Y.2d 634, 415 N.Y.S.2d 979, 389 N.E.2d 461, 1979 AMC 906 (N.Y.Ct.App.1979), *cert. granted*, —— U.S. ——, 100 S.Ct. 261, 62 L.Ed.2d 180 (1979); *Pesce v. Summa Corp.*, 1976 AMC 1097, 54 Cal.App.3d 86, 126 Cal. Rptr. 451 (1976). There have, however, almost surely been more decisions (reported and unreported) disallowing consortium claims in longshoreman personal injury suits than vice versa. *See, e. g., Wetters v. Moore-McCormack Lines, Inc.*, 1977 AMC 1529 (D.Md.1977), and certain of the cases cited and discussed therein. But general maritime law no longer presents the unequivocal face it presented in 1963, when Judge Friendly wrote that no cases had allowed the cause of action asserted herein.

In *Igneri*, after discussing the common law and general maritime law, Judge Friendly (at 266–67 & n.21) turned to the analogy presented by the Jones Act:

> If Peter Igneri had been a seaman, it would be altogether clear that his spouse's claim based on negligent injury to him would fail. Prior to the Jones Act, this result would have been readily reached on the basis, severely criticized, see 1 Harper & James supra, at 640, but nevertheless uniformly followed, that where the person directly injured has no claim, as the seaman did not, *The Osceola*, \* \* \*, 189 U.S. [158] at 175, 23 S.Ct. 483, 47 L.Ed. 760 [1903], the spouse also has none. [Citations omitted]. When Congress, by the Jones Act, 46 U.S.C.

§ 688, gave a seaman the right to recover for personal injury caused by the employer's negligence, it did not authorize recovery by the seaman's wife for loss of consortium. As to non-fatal injuries this is plain from the language of the statute, which authorizes only the seaman himself (not his wife) to "maintain an action for damages at law." [Citations omitted]. And it is established also that the damages recoverable by a seaman's widow suing for wrongful death under the Jones Act do not include recovery for loss of consortium. [Citations omitted].[21]

[21] Under the Death on the High Seas Act, 46 U.S.C. § 761, a widow can recover damages only for the "pecuniary loss" sustained by the death, and not for the loss of her husband's society and companionship. [Citations omitted].

It is true that, as a longshoreman, Peter Igneri, unlike a seaman, had a right to recover for personal injury for negligence of the vessel, based on non-statutory maritime law. [Citations omitted]. But that does not mean that in considering the novel question whether the spouse of a longshoreman should be allowed to recover for loss of consortium, we should ignore the maritime law denying any such right to the spouse of a seaman. The failure of the Jones Act to confer such a right on the spouse of a seaman cannot be dismissed as an inadvertence. The policy of the Federal Employers' Liability Act, the regime which the Jones Act made applicable to seamen, was that the new remedy for the employee was to be exclusive and that claims of relatives recognized by state law were to be abrogated; the FELA had been thus authoritatively construed before the Jones Act was passed, [citations omitted].

If there were evidence that maritime law generally recognized a claim for negligent injury to such an intangible right, or if the common law clearly authorized a wife's recovery, the gravitational pull of such concepts with respect to the wife of a longshoreman might be stronger than that of the analogy to the statute denying such recovery to a seaman's wife. But, with neither of these conditions realized, our duty to avoid capricious differences in treatment between similarly situated persons forbids our fashioning a rule that would place the spouse of a harbor-worker in a different, and better, position than the spouse of a seaman. Perceiving the anomaly in the rule which forbade a seaman, but not a harbor-worker, to recover for negligence against the ship, Congress largely ended the discrimination against seamen by passing the Jones Act; we should not create a new anomaly by giving the harbor-worker's wife a claim denied to the seaman's. Here Congress has utilized its constitutional power "to alter, qualify, or supplement" the maritime law "as experience or changing conditions might require," *Panama R.R. Co. v. Johnson*, 264 U.S. 375, 386, 44 S.Ct. 391, 68 L.Ed. 748 * * * (1924). Its action in doing so "must not be read in a spirit of mutilating narrowness"; the courts must give " 'hospitable scope' to Congressional purpose even when meticulous words are lacking." *United States v. Hutcheson*, 312 U.S. 219, 235, 61 S.Ct. 463, 467–468, 85 L.Ed. 788 * * * (1941). We can think of no reason why Congress, having ruled out a maritime claim against the ship for loss of consortium by the spouse of a negligently injured seaman, would wish the courts to construct one for the spouse of a negligently injured stevedore.

Today, in 1979, to prohibit suits for loss of consortium in longshoreman personal injury suits would create an inconsistency which it would not have created in 1963, namely, it would permit—under *Moragne*, decided in 1970, and *Gaudet*, decided in 1974—a consortium claim when the longshoreman is killed, but not when he is only injured. In 1963, no consortium claim was available in either instance. In 1963, the result reached in *Igneri* prevented an inconsistency. Today, in the light of *Moragne* and *Gaudet*, the choice is between one of two inconsistencies, because if a consortium claim is allowed when a longshoreman is injured, that result will be consistent with allowing it when a longshoreman is killed but will be

inconsistent with denying it when a seaman is killed or injured. On the other hand, denying the right when a longshoreman is injured will be consistent with denying it when a seaman is killed or injured but inconsistent with allowing it when a longshoreman is killed. To this Court, those juxtapositions suggest that wives of all longshoremen, whether killed or injured, should be treated alike, just as the wives of all seamen, whether killed or injured, are treated alike. Additionally, the presumption in favor of granting a remedy (and thereby creating a discrepancy), as opposed to withholding a remedy—which presumption led to the Supreme Court's decision in *Gaudet*, even though the result in *Gaudet* created an inconsistency—suggests the recognition of the consortium remedy in longshoreman personal injury actions.[14] That presumption would appear to operate strongly where, as in this case, the choice is not between creating a discrepancy by granting the remedy, but rather is one of choosing between discrepancies.

*Igneri*, as noted *supra*, has been followed by this Court in *Sanseverino v. Alcoa Steamship Co., Inc.*, 276 F.Supp. 894 (D.Md.

1967), before *Moragne, Gaudet* and *Higginbotham*, and by this Court in *Wetters v. Moore-McCormack Lines*, 1977 AMC 1529 (D.Md.1977), after *Moragne* and *Gaudet* but before *Higginbotham*, and also before *Doca* and *Alvez*. *Giglio*, decided shortly before *Wetters*, was apparently not called to Judge Murray's attention in *Wetters*. And some of Judge Murray's reasoning, with which many judges would probably have agreed in 1977, namely, that "[i]n actions for wrongful death, damages for loss of consortium can be awarded under the general maritime law to the spouse of *any maritime* death victim, whether longshoreman or seaman" (*Wetters* at 1537; emphasis supplied), was subsequently rejected by the Supreme Court in *Higginbotham*.

In *Giglio* and *Doca*, two federal district judges of the Southern District of New York came to a conclusion contrary to a prior holding of their own Circuit authored by a jurist as respected and outstanding as Judge Friendly. In *Alvez*, by a 5–1 vote, the highest state court in New York reached that same conclusion. It can be argued that the doctrine of *stare decisis* should lead this Court at this date to contin-

---

14. In *Moragne*, the Supreme Court created a remedy. There, the presumption in favor of so doing led the Court to overrule its own precedent, *The Harrisburg*, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886). The Court in *Moragne* also acted in the name of uniformity. However, as *Gaudet* shows, uniformity, while one of the factors to be weighed in the balance, does not necessarily control in the face of the need for a remedy. In *Gaudet*, the Supreme Court chose inconsistency over uniformity in order to prevent denial of a remedy. The Supreme Court did that when its hands were not tied by the Congress. By way of contrast, it did not hesitate in *Higginbotham* when its hands were tied by the Congress to reaffirm a discrepancy between survivors of persons killed on the high seas and survivors of persons killed in territorial waters. 436 U.S. at 623–24, 98 S.Ct. 2010.

The Jones Act, 46 U.S.C. § 688, reads as follows:

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of

the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.

The Jones Act thus differs from the Longshoremen's and Harbor Workers' Compensation Act: the latter accords a cause of action not only to the longshoreman, but also to "anyone otherwise entitled to recover damages" by reason of the injury. *See* n. 9 *supra*. The Jones Act only gives a cause of action to the seaman. Had Congress wished to treat seamen and longshoremen the same, Congress could have so indicated by making the two statutes identically restrictive.

The analogy between seamen—covered by the Jones Act—and longshoremen—covered by the Longshoremen's and Harbor Workers' Compensation Act—is thus weaker in 1979 than it was in 1963: 33 U.S.C. § 905(b) did not exist in 1963.

**522**

ue to follow *Igneri* until either the Supreme Court or the Fourth Circuit has spoken to the contrary. In that connection, it is to be noted that the Supreme Court on October 29, 1979 granted *certiorari* in *Alvez*. But before the Supreme Court opinion in *Alvez* is handed down, final dispositions in all or at least one or two of the within cases will be accomplished unless these cases are held *sub curia* pending the Supreme Court's disposition in *Alvez*. *Kozoidek* is a non-jury case; accordingly, the introduction of evidence pertaining to consortium damage creates no particular problem of prejudice to defendants therein, or otherwise. *Houston* and *Johnson* are jury cases. Bifurcation, and thus separation, of the consortium issue in the jury trials in those two cases can easily be arranged. Accordingly, no harm results in these cases if this Court is in error in granting the consortium right. It may be that other Judges of this Court will determine to continue to apply *Igneri* pending further guidance from the Supreme Court or the Fourth Circuit. While the taking of different positions by Judges of the same federal district court is of course not desirable, the undersigned member of this Court, on balance, concludes that the teachings of *Moragne, Gaudet* and *Higginbotham* strongly suggest the result reached herein.

Accordingly, for the reasons set forth *supra*, defendants' motions to dismiss or strike, as the case may be, the consortium claims asserted in these three cases will be denied.*

* Judges Harvey and Murray of this Court, who have pending before them cases in which the consortium issue posed in the within cases is also present, have indicated that they agree with the views expressed in this opinion.